IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HRD CORPORATION d/b/a | § | |
| MARCUS OIL & CHEMICAL | § | Case No. 11-36020 |
| | § | Chapter 11 |
| DEBTOR | § | |

## MOTION OF DR. EBRAHIM BAGHERZADEH
## FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE

COMES NOW, Dr. Ebrahim Bagherzadeh, Creditor[1], and files this Motion

for Appointment of a Chapter 11 Trustee:

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

---

[1] Dr. Bagherzadeh holds a judgment entered by Judge Sim Lake, confirming an arbitration award against the Debtor in the amount of over $20 million.

## I. Introduction

Since HRD filed for bankruptcy, it has done nothing to assure either this Court or the creditors that it is capable of discharging its fiduciary duties as a debtor-in-possession, filing a confirmable plan of reorganization, or worse, that it is even willing to do so.  Consider:

- It has failed to schedule significant assets, including well over 100 patents or patent applications filed with the United States Patent Office, the Patent Cooperation Treaty Office, and with other national and regional authorities.

- Its two owners, Aziz and Abbas Hassan, own 98% of Marcus Oil India ("MOI"), an Indian affiliate that received preferential transfers of at least $11,420,000 in the year prior to the petition date and a purported (but unrecorded) assignment of patent rights that is avoidable as a preference or fraudulent transfer, yet Debtor has failed to heed demands that it prosecute, or even investigate, avoidance actions.

- It has been unable to produce any credible documentation or accounting of its business transactions with MOI, or its scheduled debt of $14,000,000 to MOI.

- It is believed to have continued transferring millions of dollars to MOI after the petition date, with no oversight, no records, and no accountability.

- It has failed to file any monthly operating reports with this Court.

- Without first obtaining permission from this Court, it has actively continued frivolous litigation in another federal district court seeking to destroy and invalidate *its own patents*—property of the bankruptcy estate.

Unrestrained by either sensibility or good intentions, and despite its bankruptcy filing, HRD is still doing whatever it wants, whenever it wants, just like it always has.

There are many examples of HRD's mismanagement, and worse, outright misrepresentations to this Court and others that will be discussed in this motion. On its present course, a successful reorganization of HRD is not realistic under current management. Unless corrected by a Chapter 11 Trustee immediately, HRD's continued, gross mismanagement will lead to the loss and diminution in value of its assets. Indeed, given the misconduct of HRD's management to date, liquidation may better serve the best interests of creditors and the estate than reorganization. Because HRD's ownership and management have shown they are incapable and decidedly unwilling to steer the company toward reorganization

without a firm hand directing them, a Chapter 11 Trustee should be appointed if there is any hope to avoid irreparable loss and harm to the bankruptcy estate.

HRD has informally suggested the appointment of a Chief Restructuring Officer as a solution for HRD's deficient recordkeeping (in lieu of a trustee). While this might be a prudent and acceptable step in some Chapter 11 cases, it is insufficient protection for the creditors in this case. A CRO will not wrest control of HRD away from its two shareholders, Aziz and Abbas Hassan. So long as the Hassan brothers maintain control of HRD, the Debtor will act in their best interests and that of their Indian affiliate, not of the creditors or the bankruptcy estate. They will not take the necessary actions to avoid pre-Petition transfers of money and intellectual property to MOI, they will continue making improper transfers to MOI and they will favor their own interests and the interests of MOI over those of the creditors and the bankruptcy estate. Only a Chapter 11 Trustee can ensure that avoidance actions will be prosecuted and preserve the possibility of a recovery by the non-insider unsecured creditors.

## II. Facts

### HRD Has Failed to Schedule Significant Assets

The schedules submitted by HRD in this case are woefully inaccurate and outright misleading. Most notably, HRD has failed to schedule well over 100 patents or patent applications previously filed with the US Patent Office and Patent

4

Cooperation Treaty Office.  (*See* Amended Schedule B, Docket Entry 28, dated August 8, 2011).

A little history is necessary.  For years, HRD funded research and development of patentable ideas.  In fact, it hired Dr. Bagherzadeh to head up its research efforts.  It spent hundreds of thousands of dollars on lawyers to prosecute patents and filed dozens of patent applications, many of them ripening into patents and many others still in the prosecution process.  All of this activity was conducted in the name of HRD, and all of the patents and patent applications show HRD as the owner of the inventions.

In addition, HRD filed two lawsuits against Dr. Bagherzadeh seeking relief regarding the patents.  The two suits, now consolidated, actually seek to invalidate two of HRD's own patents, and seek to remove Dr. Bagherzadeh as inventor on many others.  In those suits, HRD represented to the federal court that it owned the patents.

After Dr. Bagherzadeh recovered a judgment against HRD in federal district court, he obtained an order from Judge Sim Lake requiring HRD to turn over all of its patents and patent rights to the U.S. Marshal for sale.  Only then did HRD

produce a 2005 assignment document purporting to assign patents to Marcus Oil India, its affiliate company.[2]

HRD's purported patent assignment to Marcus Oil India is highly dubious. After all, HRD's financial records reveal that it has paid over $1,000,000 to its patent attorneys (including Porter & Hedges, rumored to be next in line as HRD's bankruptcy counsel) for the protection and prosecution of these patents <u>during the year prior to the Petition date</u>—the very ones it claims it does not own from the assignment. **Ex. 1.**    In addition, using different lawyers[3], HRD sued Dr. Bagherzadeh seeking to invalidate some of these patents which it now insists it does not own.    *See* Plaintiff's Original Complaint, Civil Action No. 4:10-CV-01747.   The duplicity is obvious.   The motive is equally obvious: HRD knows that these patents are indeed property of the bankruptcy estate and that the purported transfer of these patents is avoidable as either a preference or fraudulent transfer.  As a debtor, HRD has a fiduciary duty to avoid unperfected transfers or encumbrances of property of the estate.  HRD is wholly disregarding that fundamental responsibility in order to further the interests of the Hassans and MOI, not that of the bankruptcy estate.

---

[2] Even if the assignment document is valid, it does not transfer post-2005 patent applications for which patents have not been granted, a category covering literally dozens of pending applications.  Those pending applications are plainly assets of HRD's bankruptcy estate and must be scheduled.

[3] The O'Donnell Ferebee law firm represents HRD in that case.

There are other assets missing from the schedules as well. HRD's 2010 balance sheet reflects ownership of company vehicles, trucks and trailers worth approximately $1.25 million. **Ex. 2.** Its 2010 balance sheet further reflects company equipment worth $2.2 million. *Id.* Neither of these items is listed on the bankruptcy schedules.

## HRD Has Demonstrated a Repeated Capacity for Misrepresentation

HRD has omitted millions of dollars in assets from its schedules. That HRD would engage in financial sleight of hand is not the least bit surprising, though, given its pre-bankruptcy behavior. Historically, when pressured, that is its preferred response. For instance, after being sanctioned more than $300,000 by a United States District Court in Delaware in 2010, HRD represented to the Delaware court that it did not have sufficient assets to pay the sanction. Indeed, it filed a 2008 year-end balance sheet from its accountant, Dorothy Pearce, with the Delaware court as purported proof of the same. **Ex. 3**. Contrast the balance sheet provided to the Delaware court with an HRD balance sheet dated just one month later produced to Dr. Bagherzadeh in post-judgment discovery. **Ex. 4**. HRD told the Delaware court it had a negative net worth in the millions of dollars, yet its own records demonstrated a significant positive net worth at the same time.

The shenanigans are not limited to the Delaware federal court. HRD continued them in the Southern District of Texas. The day before HRD filed for

bankruptcy, it withdrew one million and fifty thousand dollars ($1,050,000) in the form of a cashier's check from its account at Community Bank in Houston (**Ex. 5**). The cashier's check, payable to HRD, is dated July 11, 2011. *Id.* Yet, when United States Marshals made an in-person demand upon HRD's principals for cash toward satisfaction of Dr. Bagherzadeh's judgment and Judge Lake's garnishment order (**Ex. 6**; photo of US Marshal talking with Hassan brother), HRD's principals told the US Marshal HRD did not have any money—an outright lie given the cashier's check payable to HRD and drawn upon HRD's account. The following day, a few hours before HRD filed for bankruptcy, the $1,050,000 cashier's check was recovered by counsel for Dr. Bagherzadeh and the United States Marshals at the O'Donnell Ferebee law firm.[4]

### HRD's Lack of Transparency and Unreasonable Business Practices

HRD has filed no monthly operating reports with the Court. This is more than a failure to abide by the Court's requirements under the bankruptcy code and local rules. It demonstrates that HRD is simply unwilling to fully disclose how it is managing its affairs.

Underscoring this significant failure to provide monthly operating reports is the definitive proof showing that, at HRD, business as usual is in fact, highly

---

[4] It is unclear why the O'Donnell Ferebee law firm had possession of a $1,050,000 cashier's check made payable to HRD since it did not file HRD's bankruptcy petition and only recently has Debtor filed an application to retain O'Donnell Ferebee as "special counsel."

*unusual.* Aziz Hassan was recently deposed in this case. Mr. Hassan owns HRD along with his brother, Abbas Hassan. **Ex. 7 at 4:21-5:2.** The Hassan brothers also own 98% of HRD's affiliate company, Marcus Oil India. *Id.* **at 7:18-8:10.** Incredibly, Aziz Hassan's deposition revealed the following:

- Until January 2011, there was no written agreement between HRD and MOI, in spite of years of product shipments and payments back and forth between the two parties. *Id.* at 10:4-17.

- The 2011 agreement, executed after Dr. Bagherzadeh obtained an arbitration award against HRD, purports to retain title in MOI to all products shipped by MOI to HRD and to grant HRD only the right to make a 10% commission on sales. *Id.* at 22:5-15.

- Despite the alleged commission arrangement, the Debtor's books continue to classify payments to MOI as wax "purchases" and show no entries for commissions. Yet HRD keeps no records of the price it pays for the wax it purchases from Marcus Oil India nor any documents showing how a price could even be calculated;

- Although HRD lists $14 million in debt owed to Marcus Oil India on its Schedule F in this case, HRD has no documents or accounting records supporting the existence of this debt (*Id.* **at 20:8-20-23**); and

- There are no terms regarding the loan, HRD has no timetable for repayment of this purported $14 million debt, and is HRD not paying any interest. *Id.* **at 21:4-17.**

Effectively, the principals of HRD (who are also the principals of Marcus Oil India) simply decide at their whim when and how much money HRD should send to Marcus Oil India, without regard to what may actually be owed for purchases of product or owed on any alleged loans. Curiously, all of the amounts transferred between the companies are round numbers. In July 2011, HRD's check register shows $975,000 in wire transfers to Marcus Oil India. **Ex. 8.** Indeed, in the year before the bankruptcy, HRD's records show $11,420,000 in wire payments to Marcus Oil India. **Ex. 9.** Is there $11.42 million in corresponding wax from delivered from Marcus Oil India? HRD has produced no records to show that. What is all this money for and why are the payment amounts so strangely uniform? The paltry records produced thus far do not explain this, nor could Aziz Hassan do so.

The stark and simple truth admitted by Aziz Hassan about the dealings between HRD and MOI is this: if HRD needs money, it keeps it; if MOI needs money, HRD wires it to MOI. And the only persons who make these decisions are Aziz and Abbas Hassan.

In any event, no prudent management team would permit and worse, persist, with such ill-accounting and sham transactions like this. That the Hassan brothers have done so again and again only further justifies the need for a Chapter 11 Trustee in this case. Moreover, despite repeated requests from Dr. Bagherzadeh, HRD has taken no steps to avoid the obviously preferential transfers of all this cash to its Indian affiliate.

### The Disappearance of $17,500,000

Moreover, for many years, HRD's balance sheets have reflected the existence of a JP Morgan Chase brokerage account containing some $17.5 million. *See e.g.* **Exs. 2 and 10.** However, this brokerage account is not listed as an asset in either the bankruptcy schedules or the 2008 balance sheet submitted to the Delaware federal court. Dr. Bagherzadeh was obviously interested to learn more about the account when its existence first became known to him in post-judgment discovery.

Amazingly, Aziz Hassan testified that the account which once contained more than $17 million now contains *no money*. **Ex. 7 at 58:3-7.** Apparently, it was depleted to zero from years of mismanagement while HRD did nothing to stop it. *Id.* **at 58:8-59:3.** HRD never sued its broker (*Id.* **at 60:21-22**) or engaged in any trades to stop the bleeding. Instead, if Aziz Hassan is to be believed, he and his brother just sat idle and watched millions of dollars evaporate in the process.

Only a fool would do nothing in such a situation. Yet, unless he is lying under oath, that is precisely Aziz Hassan's testimony—that HRD did nothing to stop the loss of more than $17.5 million of HRD's money and that nonetheless, the depleted account continued to appear in error for years on its company's financial statements—company financial statements which, misleading as they were with a $17.5 million typo in them, were conceivably shown to third parties over the years.

The choice between a fool or a liar, particularly in the context of a bankruptcy reorganization, is no choice at all. It is time for a Chapter 11 Trustee to be appointed.

### III. Authorities

Section 1104 of the Bankruptcy Code governs the appointment of a trustee in Chapter 11 cases. Section 1104(a) provides that the Court shall appoint a trustee for cause such as fraud, incompetence, dishonesty or gross mismanagement by current management, or if such appointment is in the interests of the creditors, equity security holders or other interest holders. *See* 11 U.S.C. § 1104(a).[5]

---

[5] A bankruptcy Court *shall* order the appointment of a trustee, according to Bankruptcy Code Section 1104(a):

at any time after the commencement of the case but prior to confirmation of a plan, on request of a party in interest or the United States Trustee, after notice and a hearing,

(1)    for cause, including fraud, dishonest, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of

Subsection (1) of section 1104(a) addresses management's pre and post-petition misdeeds or mismanagement, while subsection (2) provides the Court with "particularly wide discretion" to appoint a trustee even absent wrongdoing or mismanagement. *In re Bellevue Place Associates*, 171 B.R. 615, 623 (N.D. Ill. 1994).

    a.    **Cause exists for the appointment of a trustee based on the conduct of debtor's management**

Fraud, dishonesty, incompetence, and gross mismanagement of a debtor's business affairs are all cause for appointment of a Chapter 11 trustee under 11 U.S.C. § 1104(a)(1). *See, e.g. In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989); *In re Colby Construction Corp.*, 51 B.R. 113, 116-118 (Bankr. S.D.N.Y. 1985). The categories enumerated in 11. U.S. C. § 1104(a)(1) "cover a wide range of conduct" and are best described as illustrative, rather than exclusive. *See In re Marvel Entertainment Corp.*, 140 F.3d 463, 472 (3d Cir. 1998) (quoting *Committee of Dalkon Shield Claimants v. A.H. Robbins Co.*, 828 F.2d at 242). The determination of whether cause exists must be taken on a case by case basis, taking

---

                holders of securities of the debtor or the amount of assets or liabilities of the debtor;

  (2)     if such appointment is in the interests of the creditors, any equity security holders, any other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor, or

  (3)     if grounds exist to convert or dismiss the case under section 1112, but the Court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

into account all relevant factors. *Sharon Steel*, 871 F.2d at 1225. Where the Court finds either that cause exists or that appointment is in the best interests of the parties, an order for the appointment of a trustee is mandatory. *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bank. D. Del. 2002).

The "cause" to appoint an examiner or a trustee may be a reason other than the enumerated factors. *Oklahoma Ref. Co. v. Blaik (In re Oklahoma Ref. Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *cf. Little Creek Dev. Corp. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Corp.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) (defining "cause" in context of dismissal statute).

Courts have appointed trustees or examiners when the debtor's insiders have conflicts of interest. In *Cajun Electric,* the Fifth Circuit affirmed the appointment of a trustee, in part, because the co-operative members were interested in purchasing part or all of Cajun Electric's assets. *Cajun Elec. Power Cooperative, Inc. v. Central Louisiana Elec. Co., Inc. (In re Cajun Elec. Power Cooperative, Inc.),* 69 F.3d 746, 751 (5th Cir. 1995) (Garza, J., dissenting), *adopted as majority opinion on reh'g,* 74 F.3d 599 (5th Cir. 1996). The Fifth Circuit held that "a trustee may be the only effective way to pursue reorganization" when the management has cross-purposes. *Cajun Elec.,* 69 F.2d at 751.

Two circuits have held that "cause" exists when appointing a Chapter 11 trustee "is the only effective way to pursue reorganization." *Cajun Elec. Power Cooperative, Inc. v. Central Louisiana Elec. Co., Inc. (In re Cajun Elec. Power Cooperative, Inc.),* 74 F.3d 599, 600 (5th Cir.) (adopted on rehearing the opinion of dissent in 69 F.3d 746, 751), cert. denied, 519 U.S. 808 (1996); *see also Marvel Entertainment Group, Inc.,* 140 F.3d 463 (3rd Cir. 1998) (adopting reasoning of *Cajun Electric* and affirming appointment of a trustee when acrimony between debtor's management and creditors undermined any ability to prosecute bankruptcy case). While *Cajun Electric* and *Marvel* have factual distinctions, both *Cajun Electric* and *Marvel* focused on the underlying problem that exists in this case: this case can proceed properly through the Chapter 11 process only if a Chapter 11 trustee is appointed.

In this case, it appears that, at a minimum, HRD management was incompetent and, at worst, fraudulent, in its failure to take action to avoid the unrecorded transfer of its patent rights, and millions of dollars in cash within the last year to Marcus Oil India. The HRD management team does not understand or care how to meet the standard of a fiduciary. Whether by incompetence or by gross mismanagement or otherwise, the debtor's management team acted repeatedly in a manner that provides no creditor confidence in their ability to act as a debtor in possession.

"Cause" exists for the appointment of a Chapter 11 Trustee because management, through its history of deceptive acts and gross mismanagement of the debtor, has (i) threatened the viability of the debtors, (ii) failed, and continue to fail, to preserve assets for the benefit of its creditors and (iii) demonstrate that it should not be entrusted with management of the Debtors' assets.

Determinations under § 1104(a) are fact intensive.  Whether cause exists is a matter within the discretion of the court.  *Committee of Dalkon Shield Claimants v. A.H. Robbins Co., Inc.*, 828 F.2d 239, 240 (4th Cir. 1987).

Factors to consider in determining whether to appoint a Chapter 11 Trustee include: (1) materiality of conduct; (2) evenhandedness or lack thereof in dealings with insiders or affiliated entities vis-à-vis other creditors or customers; (3) the existence of pre-petition voidable preferences or fraudulent transfers; (4) unwillingness or inability of management to pursue estate causes of action; (5) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; and (6) self-dealing by management or waste or squandering of corporate assets. *In re Intercat, Inc.,* 247 B.R. 911, 921 (Bank. S.D. Ga. 2000)) (citing *Committee of Dalkon Shield Claimants v. A.H. Robbins Co.,* 828 F2d 239 (4th Cir. 1987).  *See also In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 168 (Bank. S.D.N.Y. 1990) (additional factors to consider in determining whether a trustee should be appointed include "the overall management of the

debtor, past and present; the trustworthiness of the debtor's management; the nature of and availability of financial records; the movement of funds between the debtor and related entities; the ability of management to act as a fiduciary for the estate; and pragmatic considerations such as cost") and *In re Rivermeadows Associates, Ltd.,* 185 B.R. 615, 617 (Bank. D. Wyo. 1995). Every one of these factors points in favor of a trustee in this case.

A debtor in possession has the fiduciary duty to preserve estate assets for the benefit of creditors. *In re Nautilus of New Mexico, Inc.,* 83 B.R. 784, 789 (Bank. D.N.M. 1988) (citing *In re Four Score Broadcasting, Inc.,* 77 B.R. 404, 407 (Bank. W.D.N.Y 1987)). When a debtor in possession is incapable of performing these duties, a trustee is properly appointed. *Id.* (citations omitted). *See also* Glenda Raborn, *Setting Standards for Appointment of a Chapter 11 Trustee Under § 1104(a)(1) of the Bankruptcy Code:  Can a Debtor Cooperative Remain in Possession?* 18 MSCLR 509, 526 (Spring 1998) (courts tend to find "cause" under § 1104(a)(1) to remove debtors who detrimentally affect the reorganization effort or are dissipating the estate's assets). The Hassan brothers cannot be trusted to discharge their duty to preserve estate assets and must be removed from control of the Debtor.

If the Court determines that "cause" exists for the appointment of a trustee, the appointment becomes mandatory. *In re McCordi Corp.*, 6 B.R. 172 (Bank.

S.D.N.Y. 1980); *see also In re V. Savino Oil & Heating Co.,* 99 B.R. 518 (Bank. E.D.N.Y. 1989) ("Once the Court has found that cause exists under § 1104(a)(1), there is no discretion; an independent trustee must be appointed.").

### b.      Appointment of a trustee is in the best interests of creditors

Section 1104(a)(2) of the Bankruptcy Code provides a second basis for the appointment of appointment Chapter 11 trustee: "if such appointment is in the best interests of creditors." Courts have construed 11. U.S. C. § 1104(a)(2) to provide for appointment "flexible standard." *See e.g., In re Sharon Steel Corp.,* 871 F.2d at 1226; *see also Ionosphere Clubs, Inc.,* 113 B.R. 164 (Bank. S.D.N.Y. 1990). The Court has wide discretion under § 1104(a)(2), which sets forth a flexible standard for the appointment of appointment trustee; even when no "cause" exists. *See In re Bellevue Place Associates,* 171, B.R. 615 (Bank. N.D. Ill. 1994). The "factors constituting an appointment of a trustee under § 1104(a)(2) are amorphous, diverse and necessarily involve appointment great deal of judicial discretion." *Committee of Dalkon Shield Claimants,* 828 F.2d at 240. Section 1104(a)(2) emphasizes the court's discretion, allowing it to appoint appointment trustee when to do so would serve the parties' and the estates' interests." *Id.*

Courts have considered the following factors in determining whether the appointment of appointment trustee is in the best interests of the parties under

Section 1104(a)(2):  (1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for the debtor's rehabilitation; (3) the confidence or lack thereof of the business community and of creditors in present management; and (4) the benefits derived by the appointment of appointment trustee, balanced against the cost of the appointment.  *See In re Cajun Electric Power Co-Op, Inc.,* 1991 B.R. 661-62 (M.D. La. 1995) *aff'd* 74 F.3d 599 (5th Cir.), *cert. denied,* 117 S.Ct. 51 (1996); *Accord In re Ionosphere Clubs, Inc.,* 113 B.R. at 168.   *See also In re Evans,* 48 B.R. 46 (Bank. W.D. Tex. 1985) (considering the trustworthiness of the debtor; the reasons debtor acted as it did; reliance and harm to another party; evidence of detriment to the estate; the possibilities of future rehabilitation; and whether the costs of appointment trustee outweigh the protection provided to the estate by the appointment).

The facts in this case when applied to these considerations of the Court demand appointment of appointment trustee in this case.

It is axiomatic that a debtor in possession is a fiduciary.  As a fiduciary, the debtor in possession does not act in its own interest but, like a trustee, must act in the best interest of the estate.  *Commodity Futures Trading Comm. v. Weintraub,* 47 U.S. 343, 354-55 (1985).  In making that determination, courts should be cognizant of the fact that section 1104 represents a protection that the Court should not lightly disregard or encumber with overly protective attitudes towards debtors-

in-possession." *In re V. Salvino Oil & Heating Co., Inc.,* 99 B.R. 518, 525 (Bank. E.D.N.Y. 1989). And, "in an appropriate case, the appointment of a trustee is a power that is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." *In re Intercat, Inc.,* 247 B.R. 911, 920 (Bank. S.D. Ga. 2000).

The *Marvel* Court applied flexible best-interests standard and affirmed the district court's appointment in a case where the "level of acrimony found to exist certainly [made] the appointment of a trustee in the best interest of the parties and the estate." *Marvel Entertainment Corp.,* 140 F.3d at 474. The Court concluded that the parties' sharp divisions on many issues supported the district court's exercise of discretion in appointing a trustee. *Id.* at 474-76.

Here, an analysis of the relevant facts clearly demonstrates that the appointment of a Chapter 11 trustee is in the best interest of the creditors and the debtor's estate, as the debtor's non-insider creditors have no trust in management and, if this case continues on its present trajectory, there is no prospect for the debtor's rehabilitation.

The Hassans breached both their fiduciary duty of care and of loyalty to the debtors. Movant maintains that the debtor has consistently placed the interest of debtor's management and equity and Marcus Oil India ahead of the interests of

creditors in violation of their fiduciary duties.  Accordingly, the appointment of a trustee is also warranted under § 1104(a)(2) of the Bankruptcy Code.[6]

Once a party in interest has established the benefits that would flow from the appointment of a trustee, the Court can then complete the cost-benefit analysis of making such an appointment.  *Sharon Steel*, 871 F.2d at 1220.  In *Sharon Steel,* the Court upheld the bankruptcy court's finding that the cost of a having a trustee installed was trivial when compared with the costs of administration and the enormous benefit to be achieved by the re-establishment of trust and confidence in management.  *Id.*

Here, as in *Sharon Steel,* the cost of appointing a trustee would be trivial when compared to the enormous benefit to be achieved from jump-starting the reorganization process herein and the re-establishment of the trust and confidence in management.[7]

Management's fraud and gross mismanagement of the debtors has caused and continues to cause assets to dissipate.  Thus, cause exists for the appointment of a Chapter 11 trustee pursuant to § 1104(a)(1).  Once cause is found, the Court

---

[6] There is also a third basis in the code for the appointment of a trustee, that is, if there are grounds to convert or dismiss.

[7] Further, it is not necessarily true that the appointment of a trustee would eliminate the continuity of operational management.  The Court in *W.R. Grace* noted that an appointed trustee may make the rational decision to retain current management for the purpose of continuing operations, but the trustee would oversee the activities of the management.  *W.R. Grace & Co.,* 285 B.R. at 160.

must appoint a trustee.  Additionally, the appointment of a trustee is in the best interest of creditors under § 1104(a)(2) or as an alternative to dismissal under (a)(3).

For the foregoing reasons, Dr. Bagherzadeh requests that the Court order the appointment of a Chapter 11 trustee in this case.

Respectfully submitted,

**BECK, REDDEN & SECREST**

_/s/ Murray Fogler_

Murray Fogler
State Bar No. 07207300
Russell S. Post
State Bar No. 00797258
1221 McKinney, Suite 4500
Houston, Texas 77010
(713) 951-3700 Telephone
(713) 951-3720 Facsimile
mfogler@brsfirm.com

**BARNET B. SKELTON, JR., P.C.**

_/s/ Barnet B. Skelton, Jr._

Barnet B. Skelton, Jr.
State Bar No. 18456400
712 Main Street, Suite 1705
Houston, Texas 77002
(713)-659-8761 Telephone
(713)-659-8764 Facsimile
barnetbjr@msn.com

**ATTORNEYS FOR DR. EBRAHIM BAGHERZADEH**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing instrument was filed electronically on September 13, 2011 in compliance with Local Rule LR5.3. As such, this notice was served on all counsel of record who are deemed to have consented to electronic service. Pursuant to Fed.R.Civ.P. 5(d) and Local Rule LR5.3, all other counsel of record or parties in interest not deemed to have consented to electronic service were served with a true and correct copy of the foregoing instrument by U.S. First Class Mail and/or facsimile on the 13th day of September, 2011.

/s/ *Murray Fogler*

Murray Fogler